[Cite as *State v. Pinyerd*, 2024-Ohio-2521.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

ROBERT PINYERD,

    DEFENDANT-APPELLANT.

CASE NO. 3-23-20

**O P I N I O N**

Appeal from Crawford County Common Pleas Court
Trial Court No. 22-CR-0066

**Judgment Affirmed**

**Date of Decision:  July 1, 2024**

**APPEARANCES:**

    *William T. Cramer* **for Appellant**

    *Daniel J. Stanley* **for Appellee**

**MILLER, J.**

{¶1} Defendant-Appellant, Robert Pinyerd ("Pinyerd"), appeals his conviction for aggravated murder with a firearm specification, following a jury trial in the Crawford County Court of Common Pleas. For the reasons that follow, we affirm.

I.      FACTS AND PROCEDURAL HISTORY

A.      Indictment

{¶2} On March 15, 2022, Pinyerd was indicted on two counts: aggravated murder, in violation of R.C. 2903.01(A); and murder, in violation of R.C. 2903.02(A). Each count included a firearm specification under R.C. 2941.145(A). The charges stemmed from the death of Cynthia Heath ("Heath"), who had been in a romantic relationship with Pinyerd.

B.      Disclosure of Jane Beck as a Witness

{¶3} Trial was scheduled to begin on Monday, March 27, 2023. On the night of Friday, March 17, 2023 (i.e., ten days before trial), prosecutors received an email from the victim's brother's girlfriend, Valerie Hiles ("Hiles"), informing them: "We just discovered a very valuable piece of information/witness for the Pinyerd case. Can you please contact me as soon as possible?" (Mar. 20, 2023 Motion in Limine). Within a half-hour, one of the prosecutors had spoken to Hiles, who said Jane Beck ("Beck") told Hiles that she heard gunshots on the morning of Heath's death and saw Pinyerd driving away from the area. The prosecutors then directed the Crestline

Police Department interview Beck. The next day, Saturday, March 18, 2023, officers interviewed Beck and obtained a short written statement from her. Within 24 hours of the prosecutors first learning about Beck, they reached out to Pinyerd's counsel and left him a voicemail about it. They also sent him the email chain between Hiles and the prosecutors (which included Beck's phone number), the recording of Beck's police interview, and the written statement Beck had made to police. Pinyerd's counsel confirmed he received this information. (*See id.*; Mar. 21, 2023 Tr. at 15, 22-23, 33).

{¶4} On Monday, March 20, 2023, Pinyerd's counsel filed a motion in limine, asking that Beck be barred from testifying at trial. The motion explained that Beck was the only known person who heard gunshots and could place Pinyerd near the crime scene. The motion argued that Pinyerd's counsel did not have enough time to investigate Beck's allegations before the scheduled trial and Pinyerd's constitutional due process rights would be violated if Beck were allowed to testify. Additionally, according to the motion and Beck's written statement, Beck had allegedly told the police the same information a year earlier. Therefore, Pinyerd argued that the State failed to disclose her in its prior discovery responses and the police had engaged in misconduct, assuming what Beck said was true.

{¶5} The next day, Tuesday, March 21, 2023, the trial court held a hearing on the motion. The judge said that the court needed to look at the circumstances surrounding Beck's disclosure. The prosecutor then set forth his timeline for

discovering Beck's information and notifying Pinyerd's counsel. He explained that, by the time prosecutors first spoke to Beck (on Sunday, March 19), Pinyerd's counsel had already spoken to her. He also said prosecutors had no prior knowledge about Beck allegedly telling police a year earlier that she heard gunshots the morning of the murder coming from the direction of the victim's house and later saw Pinyerd driving away from the area in the vehicle the victim normally drove—which is what the State now anticipated her testifying to during the trial.

{¶6} In response, Pinyerd's counsel argued that he did not have "time to investigate the true background of this situation." (Mar. 21, 2023 Tr. at 19). However, Pinyerd's counsel went on to explain how he had already spoken with Beck and (through his defense team's efforts) learned several things that could discredit Beck and her allegations, including, but not limited to: Beck was a close friend of the victim's mother and talked to her daily; a year after Heath's death, and only days before Pinyerd's trial, she (allegedly) finally told the family this potentially significant information; Beck was known to be "crazy, eccentric, unusual, things like that"; and Beck lived about two blocks away from where the victim died, yet claims to have heard the muffled gunshots when no one else reported hearing any gunshots. (*Id.* at 21-22).

{¶7} After arguments, the judge said he would be willing to grant Pinyerd a continuance of the trial, for counsel to investigate the situation to avoid prejudice to Pinyerd. However, Pinyerd did not want a continuance. The trial court then

postponed ruling on the motion in order to conduct an evidentiary hearing on the matter. The judge saw no evidence of bad faith from the State, but wanted to learn more about the alleged conversation between Beck and interim police chief Jason Kitzmiller ("Chief Kitzmiller") from a year earlier. He scheduled the hearing to be held on Monday, March 27, 2023 at 8:30 a.m., before jury selection. The judge warned that, if he saw evidence of the State trying to "sand bag the Defense," then he would bar Beck from testifying at trial. (*Id.* at 31-32).

{¶8} The hearing took place as scheduled. Before the hearing, the judge said he was looking for evidence that the State knew about Beck and waited to identify her to the Defense in order to gain an advantage or that Beck revealed herself to the State at the last minute in order to bolster the State's case. In other words, "specifically, this Court is looking for any type of bad faith." (Mar. 27, 2023 Tr. at 6).

{¶9} At the hearing, Chief Kitzmiller testified that he had known Beck for several years, but first learned about her allegations on Friday, March 17, 2023 (i.e., the same day as prosecutors). He admitted to speaking with Beck a year earlier when officers were investigating the murder. At the time, Chief Kitzmiller had asked Beck to let them (the police officers) know if she heard of anything regarding the murder. However, according to Chief Kitzmiller, Beck did not tell them she had seen or heard anything. He believed Beck was lying when she claimed to have previously told the police she heard gunshots the morning of the murder and saw

Pinyerd driving away from the area. Chief Kitzmiller also admitted that, if Pinyerd's counsel had known of Beck's allegations around the time of the murder, then Pinyerd's counsel could have checked the cameras at a local bar for evidence of Pinyerd or the vehicle he was allegedly driving. However, the police never checked on those cameras because of their poor quality—which Chief Kitzmiller was aware of because he had watched video from those cameras for a different case. He also testified that the existence of those cameras was public knowledge. After Chief Kitzmiller finished testifying, the judge watched the recording of Beck's police interview, before ruling on the motion.

{¶10} The trial court denied Pinyerd's request to bar Beck from testifying at trial. It determined that the State disclosed Beck to the Defense with sufficient time to prepare for her testimony. The judge explained that he did not believe the Defense was unable to be prepared; in fact, Pinyerd's counsel had already spoken with Beck and the court concluded there was little more the Defense could do in terms of an investigation. The judge also determined there was no bad faith by the State, and he did not "see any evidence that the police and [Beck] were cooperating to commit some fraud on the Court or sandbag the Defense." (*Id.* at 25-26).

{¶11} However, the trial court instituted several measures to mitigate against any prejudice to Pinyerd. First, at both the March 21 hearing and after the March 27 pretrial evidentiary hearing, it offered Pinyerd a continuance, which Pinyerd declined. Second, it had already allowed Pinyerd's counsel at the pretrial

evidentiary hearing to cross-examine Chief Kitzmiller regarding Beck and her allegations. Third, it also had offered to Pinyerd's counsel that Beck be required to testify at that same pretrial evidentiary hearing, but Pinyerd's counsel declined the offer. (*See* Mar. 21, 2023 Tr. at 35-36). Fourth, Pinyerd's counsel would be afforded additional leeway in the scope of cross-examining both Beck and Chief Kitzmiller at trial. This included allowing Pinyerd's counsel to ask questions about the particular circumstances surrounding how Beck was identified as having relevant information, her alleged statements to police a year earlier, and her knowledge of the relevant parties. Fifth, if at any time during the trial the judge determined there actually was bad faith, then he would strike Beck's testimony and "give a strong limiting instruction for the jury." (Mar. 27, 2023 Tr. at 33).

### C. Trial

{¶12} The case proceeded to a jury trial, which took place from March 27 through March 31, 2023. Evidence showed Heath lived in Crestline, Ohio when she was shot three times and killed in her home on February 24, 2022.

{¶13} Haylee James ("James"), one of Heath's daughters, testified that Pinyerd had been dating Heath for about a year-and-a-half by the time of her death. Around Christmas of 2021, Pinyerd had moved in with Heath. He initially slept in the downstairs bedroom with her. However, in the weeks prior to Heath's death, Pinyerd was staying upstairs in a back bedroom.

{¶14} On the day Heath died, James received a phone call at around 8:00 p.m. from her maternal grandmother, Paula McDougal ("McDougal"). McDougal told James that Heath was missing and no one had been able to contact her since that morning. James then went to Heath's house with several people, including her uncle, her uncle's girlfriend (Hiles), and Mike Brattain ("Brattain")—who had gone out with Heath that morning for coffee. They saw that Heath's car was missing, gained entry to the house, and discovered Heath lying flat on her back on the floor.

{¶15} Soon after discovering Heath's body, James called Roger Heath ("Roger"), her step-father, to inform him that Heath had been killed. Roger lived in Alaska, and he and Heath had been going through a divorce at the time of Heath's death. James confirmed that Roger was in Alaska at the time she called him.

{¶16} A doctor from the coroner's office testified that the cause of Heath's death was multiple gunshot wounds. She had an entrance wound on the left side of her face, another on the bottom of her left ear, and the last one in her back. A bullet was found lodged in her brain. In addition to a fractured nose, Heath had sustained injuries that were characteristic of defensive wounds, including a fracture in her left hand, wounds on the back of both hands, and a wound on the back of her elbow.

{¶17} The coroner's office found material in the gunshot wounds in Heath's body. The material "was described as batting or stuffing, material that you find in a blanket or puffy coat or something like that." (Trial Tr. at 404). The doctor explained:

> [This indicated] there was an object between the muzzle of the gun and the skin, so the bullet was shot through something before entering the skin, and thus picking up the material, and it looked like a batting or stuffing material, and that was in each and every entrance wound track, entrance wound, and two of the three wound tracks.

(*Id.* at 406).

{¶18} McDougal testified that Pinyerd and Heath were in a romantic relationship at the time of her death. They were engaged at one point, but their engagement was off and on. The parties stipulated that, on November 23, 2021, Heath had requested a court to issue a civil stalking protective order against Pinyerd. McDougal testified that Heath withdrew that protective order in January of 2022, the month before her death. Heath had said she wanted to cancel it, and she had told the judge she did not feel in fear for her life and was not afraid of Pinyerd. Heath also dated Brattain, and that romantic relationship was likewise off and on. McDougal described how Heath "would be with Mike [Brattain] and then not with Mike [Brattain], it was between Mike [Brattain] and [Pinyerd] who she was with." (*Id.* at 119).

{¶19} According to McDougal, on the night before Heath's death, she had dinner with Heath and Pinyerd at her house. When Heath went out to smoke, Pinyerd told McDougal that Brattain had been at Heath's house when he (Pinyerd) got home that day and that Heath and Brattain planned to get coffee together the next morning.

**{¶20}** Brattain testified that he met Heath on November 13, 2021—a little over three months before she died. He and Heath soon started a romantic relationship. He even lived at Heath's house off and on, but had moved out of her house after having an argument with her about Pinyerd. After Brattain moved out, Pinyerd moved into Heath's house. Brattain claimed that, by the time of her death, Heath wanted Pinyerd out of the house.

**{¶21}** According to Brattain, on the morning Heath was killed, he picked her up at her house to get coffee together in Bucyrus, Ohio. Heath told him that Pinyerd was at her house when Brattain picked her up. After coffee, Brattain dropped Heath back off in an alleyway near her house at around 10:00 a.m. Heath looked back at Brattain and said Pinyerd was still there. Brattain testified that he proceeded to go to work, texted with Heath and asked if everything was okay, and Heath said she and Pinyerd were arguing. This ended up being the last time Heath ever communicated with Brattain. Brattain told her to call him "when you are done arguing." (Trial Tr. at 203).

**{¶22}** After dropping Heath off, Brattain drove to the Dublin, Ohio area for work and made calls to his employees: one at 10:16 a.m., another at 10:18 a.m., and another at 10:59 a.m. (State's Exhibit E1; *see also* Trial Tr. at 204-06). Brattain sent Heath a string of texts between 11:13 a.m. and 11:24 a.m.: "Are you sleeping or what," "Are you okay," and "Kind of worried about you you need to answer me." (State's Exhibit E2; *see also* Trial Tr. at 207). He also tried calling Heath at 11:25

a.m. and ended up trying to call her 17 times throughout the day, until he and others found her body that evening. On cross-examination, Brattain admitted that he may have told police that he dropped Heath off at the alleyway at 11:15 a.m., not 10:00 a.m. like he told the jury.

{¶23} Beck testified that, after 10:30 a.m. on February 24, 2022, she was outside and heard gunshots. Later, from a block away, she saw Pinyerd driving on the street where Heath lived. He was driving a maroon sport-utility-vehicle, known to Beck as belonging to McDougal. Among other admissions, Beck testified that she was friends with McDougal (Heath's mother).

{¶24} Police arrested Pinyerd the day after Heath's death and collected two cell phones that he had with him. Police attempted to interview Pinyerd after his arrest, but Pinyerd was "incapacitated by narcotics." (Trial Tr. at 351). Police noticed that Pinyerd had injuries, including an injury above one of his eyes and injuries on his hand. Also, Pinyerd was wearing a coat at the time he was arrested. Police sent the coat for testing, which revealed gunshot residue on the coat. Testimony from Chief Kitzmiller, Eugene Flinders ("Flinders") (who is Pinyerd's half-brother), and Flinders' girlfriend established that Pinyerd had been wearing that coat on the day Heath died.

{¶25} With the assistance of a forensic computer specialist and data analyst, police examined cell phones belonging to various individuals. It was determined that Pinyerd's phone was in the area of Heath's house at 10:22 a.m. on the morning

Heath died and in Heath's residence as late as 11:14 a.m. that morning. On the other hand, the analysis indicated the phones of Brattain and Roger were in the Columbus area and Alaska, respectively, in the late morning that day. Heath's cell phone was used to send a text message to Brattain at 10:18 a.m. that morning. The last time Heath's cell phone was active in any manner (including producing any location data) was at 10:59 a.m., although Brattain and others continued to call and send texts to her phone after that time.

{¶26} In Pinyerd's defense, Flinders (Pinyerd's half-brother) attempted to provide an alibi, testifying that Pinyerd was at his house in Mansfield. Flinders indicated Pinyerd arrived anywhere between 10:00 to 11:00 that morning. Flinders testified that he and Pinyerd "got high and sat there pretty much for a little while until I told him, hey, we cannot be sitting here nodding out high all day." (Trial Tr. at 512).

{¶27} Joey Ronk ("Ronk") testified that he knew Heath, Pinyerd, and Brattain. He was good friends with Heath, had known Pinyerd for his entire life, and had tried to help Pinyerd get through rehab. Ronk testified that Heath "feared for her life several times from Mr. Pinyerd," Pinyerd had threatened her life, and Heath was scared. (*Id.* at 582). According to Ronk, on the morning Heath was killed, she "called [him] and said that she was with Mike [Brattain] at Tim Horton's and that Mr. Pinyerd had threatened to kill her that morning, they fought and had an argument." (*Id.* at 577-78).

{¶28} Finally, Pinyerd testified in his own defense. According to Pinyerd, on the morning of Heath's death, he had his two phones with him, but one "just quit working." (*Id.* at 615). He helped one of Heath's daughters (who lived with them) get ready for school, and Heath got ready to go out with Brattain. He saw Brattain pick Heath up and them leave together. Pinyerd testified that he subsequently left Crestline around 10:30 a.m. because he had "prior obligations" in Mansfield and, when he left, Heath was not there. (*Id.*). Pinyerd later clarified that "prior obligations" meant going to a job interview at 3:00 p.m. (*Id.* at 642). Pinyerd said that he left Heath's house in McDougal's vehicle. He made several stops and arrived at his half-brother's house "no later than 11:15." (*Id.* at 618). Once there, he proceeded to use drugs—fentanyl, to his knowledge—and got high.

{¶29} On cross-examination, Pinyerd did not deny that he texted with his counselor the day before Heath's death and that the text messages he sent said, "I am stressing out right now" and "all bad with the girl, she pulled the same stuff again." (*Id.* at 635-36, 651-52). Pinyerd denied that he had threatened Heath the morning of her death or "factory reset" one of his cell phones the day after Heath's death.

D. **Verdict and Sentencing**

{¶30} The jury found Saunders guilty on both counts and both gun specifications. The trial court determined that the two counts merged, and the State elected to sentence Pinyerd on aggravated murder charge. The trial court sentenced

Pinyerd to a three-year prison term for the gun specification under R.C. 2941.145, to run consecutively with life imprisonment without parole on the aggravated murder conviction. This appeal followed.

## II. ASSIGNMENTS OF ERROR

### First Assignment of Error

**Appellant was deprived his Due Process right to a fair trial when the court permitted the prosecution to present the testimony of Jane Beck after she was only disclosed as a witness one week before trial.**

### Second Assignment of Error

**Appellant's convictions are not supported by the weight of the evidence.**

## III. DISCUSSION

### A. First Assignment of Error

{¶31} In the first assignment of error, Pinyerd argues that, by allowing Beck to testify at trial, the trial court committed a due process violation that deprived him of a fair trial. He also argues the trial court should not have relied on an earlier case because it was distinguishable: *State v. Smale*, 3d Dist. Marion No. 9-17-44, 2018-Ohio-5218. According to Pinyerd, under the circumstances, "the only effective remedy, the only way to preserve a fair trial, was to exclude Beck's testimony." (Appellant's Brief at 21).

#### 1. Alleged Due Process Violation

{¶32} For his main argument, Pinyerd relies on the following statement of law: "[T]he philosophical underpinnings of *Brady* support the conclusion that even

-14-

disclosure of potentially exculpatory evidence during trial may constitute a due process violation if the late timing of the disclosure significantly impairs the fairness of the trial." *State v. Iacona*, 93 Ohio St.3d 83, 100, 752 N.E.2d 937 (2001). However, this law does not apply to the circumstances presented here. The Ohio Supreme Court in *Iacona* further explained:

> In the landmark case of *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, the United States Supreme Court held that a criminal defendant may claim denial of due process where the state fails to disclose the existence of potentially exculpatory evidence. '[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' *Id.* at 86, 83 S.Ct. at 1196–1197, 10 L.Ed.2d at 218. But, '[i]n determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome. This standard of materiality applies regardless of whether the evidence is specifically, generally or not at all requested by the defense.' *State v. Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph five of the syllabus, following *United States v. Bagley* (1985), 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481. See, also, *State v. Treesh* (2001), 90 Ohio St.3d 460, 475, 739 N.E.2d 749, 767.

*Id.* at 88-89. The defendant bears the burden of proving a violation rising to the level of denying due process. *Id.* at 92.

{¶33} Among other possible reasons why the *Brady* Rule does not apply, Pinyerd failed to show Beck's testimony would be "potentially exculpatory evidence" or "evidence favorable to [the] accused." *Id.* at 88-89, 100. Pinyerd

acknowledges Beck said that she heard gunshots and saw Pinyerd driving away from Heath's house during the crucial time period. (Appellant's Brief at 19). However, there was no indication this testimony was favorable to him or potentially exculpatory evidence. Therefore, Pinyerd failed to show he was deprived of his due process right to a fair trial. *See State v. Varner*, 11th Dist. Trumbull No. 96-T-5581, 1998 WL 683943, *8 (Sept. 25, 1998) (where the State used a witness statement at trial regarding defendant's involvement in the incident, but that statement had not been disclosed to defendant before trial, there was no constitutional violation because the statement was not favorable to the defendant).

### 2. Crim.R. 16

**{¶34}** Apart from due process concerns, *Iacona* indicates that, when the State discloses previously undisclosed evidence before or during trial, there could be a violation of Crim.R. 16, which governs discovery in criminal proceedings. *Iacona*, 93 Ohio St.3d at 100. Pinyerd attacks the trial court's reliance on this court's decision in *Smale*, which assessed Crim.R. 16 in the context of an untimely disclosed witness.

#### i. Applicable law

**{¶35}** "The overall objective of the criminal rules 'is to remove the element of gamesmanship from a trial.'" *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, ¶ 19, quoting *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3, 511 N.E.2d 1138 (1987). "The purpose of the discovery rules 'is to prevent surprise and the secreting

of evidence favorable to one party.'" *Id.* Specifically, Criminal Rule 16 provides, in part:

> **(A) Purpose, Scope and Reciprocity.** This rule is to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large. All duties and remedies are subject to a standard of due diligence, apply to the defense and the prosecution equally, and are intended to be reciprocal. Once discovery is initiated by demand of the defendant, all parties have a continuing duty to supplement their disclosures.
>
> * * *
>
> **(I) Witness List.** Each party shall provide to opposing counsel a written witness list, including names and addresses of any witness it intends to call in its case-in-chief, or reasonably anticipates calling in rebuttal or surrebuttal. * * *

Crim.R. 16(A), (I).

{¶36} The rule does not specify exactly when witnesses must be disclosed. *See State v. Sheldon*, 3d Dist. Hardin No. 6-18-07, 2019-Ohio-4123, ¶ 76. Instead, Criminal Rule 16 generally gives the trial court broad discretion in regulating discovery. It provides:

> The trial court may make orders regulating discovery not inconsistent with this rule. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

Crim.R. 16(L)(1). Thus, this portion of the rule also governs the failure to comply with Crim.R. 16 and identifies possible sanctions for discovery violations. *Sheldon* at ¶ 73.

{¶37} If there is a discovery violation, then the trial court must inquire into the circumstances surrounding the violation. *Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, at syllabus. When deciding whether to impose a sanction, the trial court must impose the least severe sanction that is consistent with the purpose of the discovery rules. *Id.* Various factors "should govern a trial court's exercise of discretion in imposing a sanction for a discovery violation committed by the prosecution." *Id.* at ¶ 35. "[A] judge should consider * * * (1) whether the failure to disclose was a willful violation of Crim.R. 16, (2) whether foreknowledge of the undisclosed material would have benefited the accused in the preparation of a defense, and (3) whether the accused was prejudiced." *Id.*; *see also State v. Wilson*, 12th Dist. Butler No. CA2012-12-254, 2013-Ohio-3877, ¶ 16. There is no presumption of prejudice when a discovery rule violation occurs. *Sheldon* at ¶ 82.

{¶38} A trial court has broad discretion over evidentiary rulings, and such rulings will not be reversed on appeal absent an abuse of discretion. *Smale*, 2018-Ohio-5218, at ¶ 30. Likewise, "[a] trial court has discretion in determining a sanction for a discovery violation." *Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, at ¶ 33.

-18-

### ii.   Analysis

**{¶39}** In reviewing the manner in which a trial court handled an alleged discovery violation, a reviewing court must first determine whether there actually was a discovery violation. Here, although the trial court did not expressly find such a violation, it is apparent from the trial court's statements and actions that the court was dutifully protecting Pinyerd's rights against a potential discovery violation.

**{¶40}** Even assuming the State committed a discovery violation, we do not find the trial court abused its discretion by permitting Beck to testify at trial in the State's case-in-chief. In accordance with *Darmond*, the record shows the trial court made a thorough inquiry into the circumstances surrounding the State's late disclosure of Beck as a witness. *Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, at syllabus. In fact, as shown above, the trial court took several, comprehensive steps in doing so and engaged in a sound reasoning process for addressing the situation.

**{¶41}** The record does not indicate the State's late disclosure was willful or in bad faith. On the contrary, the record supports that the prosecution was just as surprised about Beck as Pinyerd's counsel and that prosecutors promptly informed Pinyerd's counsel about her. *Id*. at ¶ 19 (the purpose of the discovery rules is to prevent surprise and the secreting of evidence favorable to one party). The trial court purposefully took steps to investigate whether there was any gamesmanship. It found none and neither do we.

**{¶42}** The trial court also considered whether foreknowledge of the undisclosed material would have benefited Pinyerd in preparing a defense. In one sense, a party's preparation for a case is always benefitted by learning about the existence of evidence earlier because it gives the party more time to prepare. Although Pinyerd complained about the late notice of Beck as a witness, he has not demonstrated that having additional foreknowledge of Beck—beyond the week he had prior to trial—would have otherwise benefitted him in preparing his defense. *See Wilson*, 2013-Ohio-3877, at ¶ 18. In addition to prosecutors giving Pinyerd's counsel a copy of Beck's police interview and written statement within 24 hours of learning about her, Pinyerd's counsel clearly had time to make significant preparations. He dutifully spoke with Beck that very same day. In fact, he spoke to her before the State had done so, thus helping to mitigate potential unfairness. By the March 21, 2023 hearing, Pinyerd's counsel was able to lay out numerous topics and questions for cross-examining Beck in order to potentially hinder her credibility. (*See* Mar. 21, 2023 Tr. at 21-22, 29). Significantly, Pinyerd could have obtained a continuance in order to prepare his defense after learning about Beck, but he declined the trial court's invitations to continue the trial. *See Wilson*, 2013-Ohio-3877, at ¶ 18 (no abuse of discretion in allowing witness to testify where the trial court had provided defendant with an opportunity to interview the undisclosed witness and look into his background prior to testifying, but defendant "declined and instead chose to 'proceed on cross'").

**{¶43}** The record also does not show Pinyerd was unfairly prejudiced by the late disclosure. Again, prosecutors promptly informed Pinyerd's counsel when they were made aware of Beck, and Pinyerd's counsel even spoke to her before the prosecutors did and had time to make significant preparations for her testimony. *Id.* at ¶ 19 (although the previously undisclosed witness's testimony "certainly harmed" defendant, defendant had "not demonstrated that he was unfairly prejudiced as a result of the testimony" by the previously undisclosed witness). Additionally, as shown below in our analysis of the second assignment of error, the evidence for convicting Pinyerd of the crimes was so substantial that the outcome would have been the same, even without Beck's testimony. *Id.* (no unfair prejudice because, "even if the trial court excluded [that witness's] testimony, the outcome would have been the same").

**{¶44}** It also is apparent from the record that the trial court's actions aligned with *Darmond*'s mandate that, "'[w]hen deciding whether to impose a sanction, [the trial court] must impose the least severe sanction that is consistent with the purpose of the rules of discovery.'" *Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, at syllabus, quoting *Lakewood*, 32 Ohio St.3d 1, at paragraph two of the syllabus; *see also Lakewood*, 32 Ohio St.3d at 5. "The fact that defense counsel declined to pursue the curative measures offered by the trial court does not entitle [Pinyerd] to a finding that the trial court should have imposed the strictest remedy available, namely excluding [Beck's] testimony." *Wilson*, 2013-Ohio-3877, at ¶ 20.

-21-

Therefore, "[u]nder the facts presented, we find that the trial court did not abuse its discretion by permitting [the] witness[] disclosed in an untimely fashion to testify." *Smale*, 2018-Ohio-5218, at ¶ 42; *see also Wilson*, 2013-Ohio-3877, at ¶ 20 ("the trial court did not abuse its discretion in allowing [previously undisclosed witness] to testify as it considered the circumstances surrounding the discovery violation and imposed the least severe sanction that was consistent with the purpose of the rules of discovery"). Pinyerd's first assignment of error is overruled.

### B. Second Assignment of Error

{¶45} In the second assignment of error, Pinyerd argues that his convictions were not supported by the weight of the evidence, "the jury clearly lost its way and the guilty verdicts are a miscarriage of justice." (Appellant's Brief at 21-24).[1] According to Pinyerd, he had an alibi, there were "other suspects who were never properly investigated," and "the evidence failed to show beyond a reasonable doubt that he was the killer." (*Id.* at 22). He asserts that "[t]he evidence against [him] largely amounted to innuendo from the family who all thought he did it before any evidence was even collected." (*Id.* at 23). We disagree with Pinyerd's assertions.

#### 1. Standard of Review

{¶46} The "manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *State v. Messenger*, 171 Ohio St.3d 227, 2022-

---

[1] Pinyerd does not challenge the use of a firearm in the commission of the homicide.

-22-

Ohio-4562, ¶ 26. "[W]e review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Yet, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119. To reverse a judgment from a jury trial on the weight of the evidence, all three appellate judges must concur. Ohio Constitution, Article IV, Section 3(B)(3).

### 2. Applicable Law

**{¶47}** The murder statute provides: "No person shall purposely cause the death of another * * *." R.C. 2903.02(A). The *aggravated* murder statute provides: "No person shall purposely, and with prior calculation and design, cause the death of another * * *." R.C. 2903.01(A). Thus, for aggravated murder, evidence of purpose "does not automatically mean that the element of prior calculation and design also exists." *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, ¶ 17.

**{¶48}** "A person acts purposely when it is the person's specific intention to cause a certain result * * *." R.C. 2901.22(A). "Intent need not be proven by direct

testimony." *State v. Stallings*, 89 Ohio St.3d 280, 290, 731 N.E.2d 159 (2000). "Instead, intent to kill 'may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound.'" *Id.*, quoting *State v. Robinson*, 161 Ohio St. 213, 118 N.E.2d 517 (1954), paragraph five of the syllabus.

{¶49} Regarding the phrase "with prior calculation and design," contained in the aggravated murder statute, the Ohio Supreme Court has explained:

> '[T]he phrase 'prior calculation and design' * * * indicate[s] studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim.' *State v. Taylor* (1997), 78 Ohio St.3d 15, 19, 676 N.E.2d 82, 88. The amount of care or time that the defendant spends in planning and analyzing the crime are not critical factors in themselves; however, they 'must amount to more than momentary deliberation.' *Id.* In short, there is no bright-line test for determining the existence of prior calculation and design. *Id.* at 20, 676 N.E.2d at 89. '[E]ach case turns on the particular facts and evidence presented at trial.' *Id.*

*State v. Jones*, 91 Ohio St.3d 335, 345, 744 N.E.2d 1163 (2001). "[B]y its own terms[, the phrase] suggests advance reasoning to formulate the purpose to kill." *Walker* at ¶ 18.

> Three factors have traditionally been considered in determining whether prior calculation and design exists: '(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?'

*State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, ¶ 319, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997).

### 3. Analysis

{¶50} At Pinyerd's trial, there was substantial, credible evidence upon which a jury could reasonably conclude that all the elements of the crimes had been proven beyond a reasonable doubt. This is true even without considering Beck's testimony.

{¶51} First, evidence at trial supported that Pinyerd was the person who caused Heath's death. For example, cell phone evidence put Pinyerd at the scene of the crime, not where his alibi put him. Brattain's testimony indicated Pinyerd was the last person with Heath before she died and that Heath and Pinyerd had been arguing. Cell phone evidence also indicated Heath's cell phone was near the same location as Pinyerd's cell phone until it became completely inactive. Other testimony indicated Pinyerd had recently threatened to kill Heath. Additionally, gunshot residue was found on the coat Pinyerd had been wearing on the day Heath was killed. Pinyerd had no explanation for why gunshot residue would be found on his coat. *State v. Curtis*, 12th Dist. Brown No. CA2009-10-037, 2010-Ohio-4945, ¶ 22-23 (affirming conviction for aggravated murder; "[a]lthough much of the evidence against appellant was circumstantial, a conviction based on purely circumstantial evidence is no less sound than one based on direct evidence" and "certain facts can only be established by circumstantial evidence").

{¶52} Next, evidence at trial supported that Pinyerd acted purposely in causing Heath's death. She sustained injuries described as defensive wounds and a fractured nose. She died because of multiple gunshot wounds. This included being shot in the head—right through her face. *Stallings*, 89 Ohio St.3d at 290 (intent to kill may be deduced from the instrument used to produce death, its tendency to destroy life, and the manner of inflicting a fatal wound).

{¶53} Evidence at trial also supported that Pinyerd caused Heath's death with "prior calculation and design." R.C. 2903.01(A). Their romantic relationship at the time was strained. Pinyerd did not deny that he texted with his counselor the day before Heath's death and that the text messages he sent said, "I am stressing out right now" and "all bad with the girl, she pulled the same stuff again." (Trial Tr. at 635-36, 651-52). The crime took place soon after the victim met up for coffee with another man—something that McDougal testified Pinyerd knew about the night before. Pinyerd himself acknowledged that, on the morning of Heath's death, he knew Heath was going out for coffee with Brattain and saw them leave together. His testimony also indicated Heath's daughter left the house for school by 8:30 a.m., while other testimony and cell phone evidence indicated Pinyerd was waiting for Heath to return home. *See State v. Hope*, 11th Dist. Trumbull No. 2018-T-0053, 2019-Ohio-2174, ¶ 60 (presence of sufficient time and opportunity for planning murder between defendant's argument with victim the night before created a reasonable inference of prior calculation and design, even though "[t]he killing itself

may have been an almost instantaneous eruption after [victim] entered the residence"); *State v. Robbins*, 58 Ohio St.2d 74, 78-79, 388 N.E.2d 755 (1979) ("prior calculation and design" found where defendant "used extreme aggression" against victim, then left "the victim in the hallway and return[ed] to his apartment to secure the weapon which he used to stab the victim to death instants later"). Plus, witnesses testified that Pinyerd had threatened to kill Heath, including making such a threat the morning she died. *State v. Awkal*, 76 Ohio St.3d 324, 330, 667 N.E.2d 960 (1996) (evidence supporting a finding of "prior calculation and design" included that, "[p]rior to the shooting, [defendant] threatened to kill" his wife).

**{¶54}** Additionally, the bullets were fired through material containing batting, which would have muffled the sound. This was evidence of using the material "as a silencer, indicating forethought in the execution of the crime." *State v. Bringht*, 8th Dist. Cuyahoga No. 55345, 1989 WL 59233, * 8 (June 1, 1989) (affirming conviction for aggravated murder). This too was indicative of "prior calculation and design." *E.g.*, *id.*; *Curtis*, 2010-Ohio-4945, at ¶ 24 (fact that a pillow had been placed between the gun and victim helped show the State had established "prior calculation and design"); *State v. Brooks*, 25 Ohio St.3d 144, 152-153, 495 N.E.2d 407 (1986) (among the circumstantial evidence supporting a finding of "prior calculation and design" was that appellant had "turned up the volume of his stereo to muffle the sound of the gunshots").

**{¶55}** Based on this evidence we do not find that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that we must reverse the convictions and order a new trial. Pinyerd's second assignment of error is overruled.

## IV. CONCLUSION

**{¶56}** For the foregoing reasons, Pinyerd's assignments of error are overruled. Having found no error prejudicial to the appellant in the particulars assigned and argued, we affirm the judgment of the Crawford County Court of Common Pleas.

***Judgment Affirmed***

**WALDICK and ZIMMERMAN, J.J., concur.**

**/hls**