[Cite as *State v. Radabaugh*, 2024-Ohio-5640.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HARDIN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

HAYDEN SCOTT RADABAUGH,

    DEFENDANT-APPELLANT.

CASE NO. 6-24-01

O P I N I O N

**Appeal from Hardin County Common Pleas Court**
**Trial Court No. CRI 20222138**

**Judgment Affirmed in Part and Reversed in Part**

**Date of Decision: December 2, 2024**

APPEARANCES:

    *Christopher Bazeley* **for Appellant**

    *Morgan S. Fish* **for Appellee**

**MILLER, J.**

{¶1} Defendant-Appellant, Hayden Radabaugh ("Radabaugh"), appeals from the December 21, 2023 judgment entry of the Hardin County Court of Common Pleas, following a jury trial. For the reasons that follow, we affirm in part and reverse in part. Specifically, we vacate the imposition of court-appointed-counsel fees, remand this matter to the trial court with instructions to resentence Appellant on the aggravated robbery conviction, and affirm the trial court's judgment in all other respects. We reject Radabaugh's challenges to the trial court's decisions to call three witnesses as court's witnesses, admit various crime scene photographs, and impose a fine and restitution, as well as his ineffective assistance of counsel claim and challenges to his convictions.

## I. FACTS AND PROCEDURAL HISTORY

### A. Indictment and Pretrial Motion Regarding Court's Witnesses

{¶2} This case arose from the death of Robert Mays, Jr. ("Mays") on July 7, 2021. On October 20, 2022, Radabaugh was indicted on seven counts:

    (1)    Aggravated Murder pursuant to R.C. 2903.01(A), with a specification pursuant to R.C. 2941.145(A);

    (2)    Aggravated Murder pursuant to R.C. 2903.01(B), with a specification pursuant to R.C. 2941.145(A);

    (3)    Aggravated Robbery pursuant to R.C. 2911.01(A)(1), with a specification pursuant to R.C. 2941.145(A);

(4)     Aggravated Robbery pursuant to R.C. 2911.01(A)(3), with a specification pursuant to R.C. 2941.145(A);

(5)     Having Weapons While Under Disability pursuant to R.C. 2923.13(A)(2);

(6)     Improperly Handling Firearms in a Motor Vehicle pursuant to R.C. 2923.16(B); and

(7)     Tampering with Evidence pursuant to R.C. 2921.12(A)(1).

**{¶3}** On December 7, 2022, in response to Radabaugh's demand for a Bill of Particulars, the State made the following allegations:

[O]n or about July 7th 2021, the defendant . . . openly discussed with Valerie Lewis, Andrew Wells, and Dane Honaker, in his mother's boyfriend's Kia motor vehicle the robbing and murder of Robert B Mays. . . .

The parties picked up Robert Mays in Findlay, Ohio with the story of needing him to assist in carrying out prearranged drug deals. . . .

[At] Radabaugh's prearranged signal that the criminal activities were to start[,] Andrew Wells utilizing a loaded 9 mm Tauris and force made Robert Mays get out of [the] rear seat on the driver's side onto CR 265. . . . While Hayden Radabaugh was out of the car on CR 265[,] Valerie Lewis handed him th[r]ough the driver side window the upfront loaded stored Smith & Wesson AR 22 cal semiautomatic firearm. Hayden Radabaugh then shot Robert Mays with more than 10 rounds with the AR 22 killing him in the process. The parties got back in the Kia [and] drove southwest . . .

Enroute discussion was had in the motor vehicle on getting their stories straight and the disposing of the firearms at Valerie Lewis's dad's house. Valerie was to go into the residence to distract her father while [Radabaugh], Dane and Andrew Wells hide the firearms in the tore-down building debris on Valerie Lewis's father's property. This hiding action did take place as planned. . . .

> Robert Mays had his money, illegal drugs and jewelry taken from him pursuant [to] the robbery. . . .

(Bill of Particulars).

{¶4} On May 12, 2023, the State filed a motion asking that Andrew Wells ("Wells"), Valerie Lewis ("Lewis"), and Dane Honaker ("Honaker") be witnesses called by the court at trial, pursuant to Evid.R. 614(A). As set forth in the Bill of Particulars, the State had alleged those three individuals discussed robbing and murdering Mays with Radabaugh beforehand and were with Radabaugh at the time Mays was killed. Radabaugh's attorney did not file a response to the motion or object to the State's request that those three persons be called as court's witnesses at trial. The trial court granted the motion.

**B.     Trial**

{¶5} The case eventually proceeded to a jury trial, which took place from November 1 through November 9, 2023. In addition to Wells, Lewis, and Honaker, 20 other witnesses testified and the court admitted over 200 exhibits during the course of the trial. Among the evidence was the following.

{¶6} Jordan Schmidt ("Schmidt") testified he was with Wells, Honaker, and Radabaugh the night before Mays' death. They talked about wanting to commit a robbery and, according to Schmidt, Radabaugh led that conversation. Mays' name was one of those that came up in discussing potential targets for the robbery.

Honaker and Wells confirmed this during their testimony. Wells also identified some pictures taken from his phone, which included pictures from Schmidt's house in the early morning hours of June 7, 2021, i.e., the date of Mays' death. In one picture, Radabaugh is posing with a .22 caliber assault rifle.

{¶7} Honaker testified that Radabaugh informed Mays by text message that they would pick him up, under the guise that Mays would be helping with a drug transaction. According to Wells, Lewis, and Honaker, Radabaugh drove the four of them in a black car to pick up Mays. On the way, they discussed plans for committing the robbery. They also discussed killing Mays, with Honaker testifying that Radabaugh said he (Radabaugh) was going to do the killing. Lewis hid an assault rifle in the front passenger seat while Radabaugh drove and Honaker and Wells rode in the back.

{¶8} They picked up Mays, who was wearing a jeweled necklace and had a bag with marijuana and cash. After stopping at a Circle K store (where a surveillance camera took a picture of Radabaugh in a distinctive, two-tone coat), they drove out of town and through a rural area. At Radabaugh's predetermined signal, he pulled the car over and Wells successfully forced Mays out of the rear door on the driver's side at gunpoint. Radabaugh obtained the assault rifle from Lewis. Mays asked, "What did I do," and Radabaugh responded by shooting him. Mays dropped to the ground and never got up. When asked how many rounds

Radabaugh shot, Wells testified it was "[a] lot," "[m]ore than ten probably." (Trial Tr. at 1260). A witness who lived near the scene testified he heard a series of shots, a short pause, and then another series of shots.

{¶9} Wells, Lewis, and Honaker each testified that Radabaugh shot Mays and that no one else fired a weapon. They left Mays' body and cell phone on the road where Radabaugh had killed him, but they had Mays' necklace, bag, marijuana, and cash in the car. Radabaugh drove them away, and they decided to go to Lewis's father's house to hide the guns. Honaker testified that "the plan was, heat is on, bury the guns, come back for them later when things cooled down." (*Id.* at 1161). Lewis's father testified that his daughter came to his house, with Radabaugh, during the evening hours of July 7, 2021 and stayed for about an hour.

{¶10} While Lewis purposely kept her father distracted and occupied in the house, Wells, Honaker, and Radabaugh took the guns—along with some of the clothes they were wearing, such as Radabaugh's distinctive coat—to the back of the property and hid them in a pile in the ground under a large piece of metal and other debris. According to Wells, they hid some of their clothes because they were worried about getting caught, knowing they wore those clothes earlier in town and could have been recorded on camera wearing them. Special Agent David Hammond of the Ohio Bureau of Criminal Investigation testified that a two-color coat, a black sweatshirt, and an assault rifle were later found at the property under a piece of

metal. A forensic scientist testified that the assault rifle was operable and, based on his testing, concluded that the seven bullet casings recovered from the scene of Mays' death were fired from that gun.

{¶11} According to Honaker, he, Wells, and Radabaugh split up Mays' marijuana and money, with each getting some of it. Lewis likewise testified they divided up the money, and both Lewis and Wells testified that Wells took the necklace and marijuana with him after Mays' death. Wells testified he had given some of the money to Radabaugh and Honaker to spend at a festival a few nights after Mays' death.

{¶12} Both after the State rested its case and the Defense rested its case, Radabaugh's counsel made a Crim.R. 29 motion, which the trial court denied. At the end of the trial, the jury found Radabaugh guilty on all seven counts.

C. **Sentencing**

{¶13} On December 19, 2023, the trial court held a sentencing hearing. The trial court found that Counts 1 and 2 were allied offenses subject to merger; Counts 3 and 4 were allied offenses subject to merger; and Counts 5 and 6 were allied offenses subject to merger. Of those pairs of counts, the State chose to proceed to sentencing on Counts 1, 4, and 5.

{¶14} The trial court sentenced Radabaugh to the following terms of imprisonment: life in prison without the possibility of parole for Count 1

(aggravated murder), plus three years in prison for the firearm specification; 11 years minimum to 16.5 years maximum for Count 4 (aggravated robbery), plus three years for the firearm specification; 36 months for Count 5 (having weapons while under disability); and 36 months for Count 7 (tampering with evidence). The trial court found consecutive sentencing was necessary, resulting in a life sentence without the possibility of parole plus 23 to 28.5 years in prison. Additionally, the trial court ordered that Radabaugh: (a) pay a $20,000 fine for his aggravated murder conviction; (b) pay court costs; (c) be assessed court-appointed-counsel fees as a civil assessment; and (d) pay restitution in the amount of $7,482.24—jointly and severally with Honaker, Lewis, and Wells—to Mays' father for funeral expenses and lost wages incurred while making funeral arrangements. This appeal followed.

## II.    ASSIGNMENTS OF ERROR

{¶15} Radabaugh raises seven assignments of error for our review:

### First Assignment of Error

**The two counts of aggravated robbery in the indictment were duplicitous and the convictions must be vacated.**

### Second Assignment of Error

**The trial court plainly erred when it granted the State's motion to call three witnesses as court witnesses pursuant to Evid.R. 614.**

**Third Assignment of Error**

**Radabaugh's defense was prejudiced by ineffective assistance of counsel.**

**Fourth Assignment of Error**

**Radabaugh's convictions for aggravated robbery and tampering with evidence are not supported by legally sufficient evidence.**

**Fifth Assignment of Error**

**The trial court plainly erred when it admitted gruesome photographs of the crime scene.**

**Sixth Assignment of Error**

**The trial court failed to properly advise Radabaugh of his rights under the Regan Tokes Act as required by R.C. 2929.19.**

**Seventh Assignment of Error**

**The trial court's imposition of a fine, appointed counsel fees, and restitution are contrary to law and against its own finding that he lacks the ability to pay.**

**III. DISCUSSION**

{¶16} We address the assignments of error out of order in a manner that facilitates our analysis.

**A.    First Assignment of Error**

{¶17} In the first assignment of error, Radabaugh argues that the two aggravated robbery counts in the Indictment (Counts 3 and 4) were duplicative. He more specifically complains that the Indictment, Bill of Particulars, and jury

instructions failed to identify "which stolen item was the basis of either count of Aggravated Robbery" and that, in closing arguments, the State argued Radabaugh stole four items from Mays (a necklace, money, a bag, and marijuana), but "failed to link a particular item to either of the charges."  (Appellant's Brief at 4).

### 1.    Standard of Review

{¶18} Radabaugh concedes that we review this issue under a plain-error standard because he never raised it with the trial court.  *See also State v. Noling*, 2002-Ohio-7044, ¶ 60-62; Crim.R. 12(H), 52(B).  "To qualify for plain-error relief, the appellant must establish: (1) occurrence of an error, i.e., a deviation from a legal rule; (2) the error was plain, i.e., it was an obvious defect in the trial proceedings; and (3) the error affected the appellant's substantial rights, meaning the error 'must have affected the outcome of the trial.'"  *State v. Cass*, 2024-Ohio-2614, ¶ 57 (3d Dist.), quoting *State v. Morgan*, 2017-Ohio-7565, ¶ 36.  Additionally, the decision to correct a plain error is discretionary and should be made with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.  *Noling* at ¶ 62.

### 2.    Applicable Law

{¶19} "Duplicity in an indictment is the joinder of two or more separate offenses in a single count."  *Parker v. Maxwell*, 174 Ohio St. 471, 471 (1963); Crim.R. 8(A) ("[t]wo or more offenses may be charged in the same indictment,

information or complaint *in a separate count for each offense…*" [emphasis added]).

Thus, an indictment is duplicitous if it sets forth separate and distinct crimes in one

count. *Cass*, 2024-Ohio-2614, at ¶ 58 (3d Dist.); *see also* R.C. 2941.28 (referencing

duplicity as a defect in an indictment and setting forth potential remedies).

{¶20} Aggravated robbery under R.C. 2911.01(A) is an offense that includes

"attempting or committing a theft offense" as one of its elements. R.C. 2911.01(A);

*see also State v. Horner*, 2010-Ohio-3830, ¶ 53. Specifically, the aggravated

robbery statute provides, in relevant part:

> (A) No person, in attempting or committing a theft offense, as defined in [R.C. 2913.01], or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> > (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
> >
> > . . .
> >
> > (3) Inflict, or attempt to inflict, serious physical harm on another.

R.C. 2911.01(A)(1), (3). The term "theft offense" in the statute is defined to include

a violation of R.C. 2913.02, the theft statute. R.C. 2913.01(K). In turn, the theft

statute provides, in relevant part:

> (A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent;

. . .

(4) By threat;

(5) By intimidation.

R.C. 2913.02(A)(1), (4), (5).

### 3. Analysis

**{¶21}** The language in the Indictment for the two counts of aggravated robbery correctly tracks the language of the aggravated robbery statute. *See Horner*, 2010-Ohio-3830, at ¶ 45. Also, as set forth above, the Bill of Particulars identified both the property owner (Mays) and property he was deprived of pursuant to the robbery.

**{¶22}** Radabaugh has not established plain error. As an initial matter, we disagree with Radabaugh's suggestion that the two counts were duplicative when comparing one to the other. Such a comparison does not fit with a duplicity argument given that duplicity in an indictment is "the joinder of two or more separate offenses *in a single count*." (Emphasis added.) *Parker*, 174 Ohio St. at 471. Moreover, the two counts alleged a violation of different provisions of the aggravated robbery statute, namely R.C. 2911.01(A)(1) in Count 3 and R.C. 2911.01(A)(3) in Count 4. Those counts therefore alleged different ways of

committing aggravated robbery: having a deadly weapon versus inflicting serious physical harm. Additionally, although the jury found Radabaugh guilty of both counts, the trial court at sentencing found the two counts were allied offenses subject to merger. Accordingly, Radabaugh was only convicted and sentenced on just one of the counts: Count 4. *See* R.C. 2941.25(A) ("[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one").

{¶23} Next, Radabaugh argues there is duplicity within each of the two counts. He complains the State never identified which stolen item was the basis of either aggravated robbery offense, thereby creating the potential for different items to be the subject of the theft-offense element of the aggravated robbery. (Appellant's Brief at 4). According to Radabaugh, this created a jury unanimity problem in that different jurors could have found him guilty based upon the theft of different items or combinations of those items. (*Id.* at 5).

{¶24} While it is true that, pursuant to Crim.R. 31(A), the jury's "verdict shall be unanimous," we disagree that there is a jury unanimity problem here. The situation presented "does not involve multiple distinct crimes, but instead multiple ways in which an element of a crime may be satisfied." *State v. Schell*, 2017-Ohio-2641, ¶ 44 (9th Dist.). Long ago, the Supreme Court of Ohio held: "Where several

articles of property are stolen at the same time, the transaction being the same, the whole, although they belong to different owners, may be embraced in one count of the indictment and the taking thereof charged as one offense." *State v. Hennessey*, 23 Ohio St. 339 (1872), syllabus. The Bill of Particulars alleged, and the evidence at trial demonstrated, a single incident formed the basis for the aggravated robbery counts. Essentially, Radabaugh and his three associates planned to rob Mays; picked Mays up in a vehicle; forced Mays out of the vehicle; stole items Mays had with him; Radabaugh shot Mays to death in the process; and they fled in the vehicle with the stolen items. All of these acts were committed by the four individuals acting in concert with one another.

{¶25} "Although Crim.R. 31(A) requires juror unanimity on each element of the crime, jurors need not agree to a single way by which an element is satisfied." *State v. Gardner*, 2008-Ohio-2787, ¶ 37-38 ("the law on juror unanimity distinguishes between the elements of a crime and the means by which a defendant commits an element").[1] The Supreme Court of Ohio in *Gardner* approvingly explained that the U.S. Supreme Court, in "[a]pplying the federal counterpart of Crim.R. 31(A)," found "that a 'jury need not always decide unanimously which of

---

[1] Although *Gardner* did not actually involve duplicity and is not binding on this court because it is a plurality opinion, it addressed the underlying concern Radabaugh raises in this assignment of error (juror unanimity) and we find it persuasive. Furthermore, Radabaugh's primary authority in support of his argument, *State v. Ward*, 2011-Ohio-518 (9th Dist.), relies on *Gardner*.

several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." *Id.*, quoting *Richardson v. United States*, 526 U.S. 813, 817 (1999).

> Where, for example, an element of robbery is force or the threat of force, some jurors might conclude that the defendant used a knife to create the threat; others might conclude he used a gun. But that disagreement—a disagreement about means—would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force.

*Richardson*, 526 U.S. at 817.

{¶26} "[T]he identity of the personal property stolen from [the victim] is not an element of the offense of aggravated robbery." *State v. Moten*, 2012-Ohio-6046, ¶ 34 (2d Dist.) (affirming conviction despite bill of particulars identifying a wallet as the stolen item where evidence did not show a wallet was stolen but did show victim's watch was stolen). Instead, the jury had to unanimously conclude that the State had proven, beyond a reasonable doubt, that "a theft offense" was attempted or committed. R.C. 2911.01(A); *Richardson*, 526 U.S. at 817. Consequently, the jury did *not* need to specifically find whether the property Radabaugh stole was a necklace, money, a bag, or marijuana (or any particular combination of those items). Finding beyond a reasonable doubt that Radabaugh attempted or committed a theft offense involving any of the items taken from Mays was sufficient to establish the element of "attempting or committing a theft offense" required for aggravated

robbery. *See State v. Thompson*, 33 Ohio St.3d 1, 11 (1987); *Schell*, 2017-Ohio-2641, at ¶ 46.

**{¶27}** We are also mindful that, in addition to principal offender instructions, the trial court's final instructions to the jury included an instruction on complicity for the aggravated robbery and other charges. (Trial Tr. at 1581-83). This provided another method for finding the element of attempting or committing a theft offense satisfied with respect to any of the items. *See* R.C. 2923.03; *State v. Skatzes*, 2004-Ohio-6391, ¶ 32 (a charge of complicity may be stated in terms of the principal offense); *State v. Walker*, 2019-Ohio-3121, ¶ 103-110 (2d Dist.) (where jury was instructed regarding complicity, conviction for aggravated robbery as either "an aider and abettor or principal offender" regarding a particular item was not against the manifest weight of the evidence or supported by insufficient evidence).

**{¶28}** In support of his argument, Radabaugh primarily relies on *State v. Ward*, 2011-Ohio-518 (9th Dist.). *Ward* involved a situation where the defendant was charged with one count of aggravated robbery, yet—as the prosecutor admitted in opening statements—the defendant had committed two robberies with multiple victims. *Ward*, 2011-Ohio-518, at ¶ 4, 9-11, 13. Unlike *Ward*, Radabaugh complains the multiple items taken from Mays created multiple potential theft offenses underlying the aggravated robbery, i.e., multiple ways in which an element of the aggravated robbery offense could be satisfied. Thus, *Ward* is clearly

distinguishable. *See Schell*, 2017-Ohio-2641, at ¶ 44, 46 (distinguishing *Ward*); *Gardner*, 2008-Ohio-2787, at ¶ 37-38, 62, 71; *Richardson*, 526 U.S. at 817.

**{¶29}** Radabaugh's first assignment of error is overruled.

### B.     Fourth Assignment of Error

**{¶30}** In the fourth assignment of error, Radabaugh asserts that his convictions for both aggravated robbery and tampering with evidence were not supported by legally-sufficient evidence and were against the manifest weight of the evidence.[2]

### 1.     Standard of Review

**{¶31}** Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Dent*, 2020-Ohio-6670, ¶ 15. Thus, our review is de novo. *Id.* A sufficiency challenge disputes whether a party met its burden of production at trial. *State v. Messenger*, 2022-Ohio-4562, ¶ 26. "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *Dent* at ¶ 15, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Thus, "[i]n

---

[2] Radabaugh's assignment of error only challenges the sufficiency of the evidence. However, in his argument in support of this assignment of error, he comingles his sufficiency argument with a manifest-weight-of-the-evidence claim.

assessing the sufficiency of the evidence, we do not resolve evidentiary conflicts or assess the credibility of witnesses." *State v. Jackson*, 2023-Ohio-2193, ¶ 26 (3d Dist.); *see also Jenks* at 279.

**{¶32}** On the other hand, the "manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *Messenger* at ¶ 26. "[W]e review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 2018-Ohio-1562, ¶ 168. Yet, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119. To reverse a judgment from a jury trial on the weight of the evidence, all three appellate judges must concur. Ohio Const., art. IV, § 3(B)(3).

### 2. Applicable Law and Analysis

#### a. *Aggravated robbery*

**{¶33}** The aggravated robbery statute and associated legal principles concerning that offense are set forth above in our discussion of the first assignment of error. Given that Radabaugh was convicted of Count 4, our analysis centers on

that count, which charged a violation of R.C. 2911.01(A)(3) involving serious physical harm.

{¶34} Radabaugh's argument focuses on an alleged lack of evidence that Radabaugh stole Mays' necklace or anticipated that someone else would steal it. Thus, the argument relates to only one of the items stolen from Mays and is based on Radabaugh's duplicity and juror unanimity concerns. However, as explained in our discussion of the first assignment of error, the State was not required to prove that Radabaugh stole one item in particular. The jury was charged with determining whether the State had proven, beyond a reasonable doubt, that Radabaugh "inflict[ed], or attempt[ed] to inflict, serious physical harm on" Mays "in attempting or committing a theft offense … or in fleeing immediately after the attempt or offense." R.C. 2911.01(A)(3). Additionally, the jury was instructed it could consider a complicity theory with Radabaugh aiding and abetting his co-conspirators in committing the aggravated robbery.

{¶35} Moreover, "if the evidence supports the verdict under one factual alternative, we need not reverse the conviction simply because the evidence is insufficient to support another." *State v. Frunza*, 2003-Ohio-4809, ¶ 7, 9-10 (8th Dist.) (rejecting sufficiency and weight of the evidence arguments for robbery conviction where the evidence was insufficient to sustain the charged offense based on one act of the defendant that did not rise to the level of physical harm, but the

court upheld the conviction based on other acts that the defendant did not dispute constituted physical harm).

**{¶36}** The evidence at trial demonstrated that Radabaugh inflicted "serious physical harm on" Mays. All three of Radabaugh's co-conspirators testified that Radabaugh shot Mays multiple times, causing his death. *E.g., State v. Bishop*, 2007-Ohio-6197, ¶ 11, 60-61 (8th Dist.) (defendant inflicted serious physical harm upon victim by shooting him in the leg and then in the temple at close range, an act that killed the victim).

**{¶37}** Additionally, the evidence demonstrated that Radabaugh shot Mays "in attempting or committing a theft offense." R.C. 2911.01(A). Testimony at trial included that, on the night before Mays' death, Radabaugh and others discussed wanting to commit a robbery and Mays was identified as a potential target. Radabaugh subsequently texted Mays under the guise of needing his help with a drug transaction, and Radabaugh, Honaker, Wells, and Lewis all openly discussed plans for robbing Mays while Radabaugh drove them to pick up Mays. After driving to a remote location, Mays was forced out of the car, had items taken from him, and was shot multiple times by Radabaugh. Radabaugh and the others then drove away with Mays' property. Thereafter, Radabaugh spent a portion of the money that he had stolen from Mays. Thus, there was more than enough evidence at trial to substantiate the jury's verdict that the State had proven, beyond a reasonable doubt,

the essential elements of aggravated robbery under R.C. 2911.01(A)(3). *See State v. Wade*, 2023-Ohio-3490, ¶ 4, 8, 29-30, 49-51 (10th Dist.) (aggravated robbery conviction was supported by sufficient evidence, and was not against manifest weight of the evidence, where victim was shot to death and a witness testified that defendant and another person planned to steal drugs from victim, the witness waited in a car while defendant and the other person went to the victim's house, defendant and the other person returned to the car with the victim's gun, and the other person told the witness that defendant had shot the victim).

### b. *Tampering with evidence*

{¶38} Tampering with evidence under R.C. 2921.12(A)(1) consists of three elements. *Cass*, 2024-Ohio-2614, at ¶ 37 (3d Dist.). "First, 'the knowledge of an official proceeding or investigation in progress or likely to be instituted.'" *Id.*, quoting *State v. Straley*, 2014-Ohio-2139, ¶ 11. "Second, 'the alteration, destruction, concealment, or removal of the potential evidence.'" *Id.* "Third, 'the purpose of impairing the potential evidence's availability or value in such proceeding or investigation.'" *Id.* In order to support a tampering charge, "the evidence tampered with must have some relevance to an ongoing or likely investigation." *Straley* at ¶ 16.

{¶39} Radabaugh's argument concerning the tampering with evidence conviction focuses on an alleged lack of evidence that Radabaugh wiped

fingerprints from the firearm(s) or ammunition. However, this ignores evidence about Radabaugh hiding evidence, including the assault rifle and the two-tone coat he was wearing. The testimony at trial clearly established that the plan after killing Mays was for Lewis to distract her father while Radabaugh, Honaker, and Wells hid the firearms in the debris on her father's property. The evidence presented at trial was sufficient to allow a rationale trier of fact to find the essential elements of the crime beyond a reasonable doubt when viewed in a light most favorable to the prosecution. Further, we do not find that the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction.

{¶40} Therefore, we reject Radabaugh's arguments that his convictions for aggravated robbery and tampering with evidence were not supported by legally-sufficient evidence and were against the manifest weight of the evidence.

{¶41} Radabaugh's fourth assignment of error is overruled.

### C.      Second Assignment of Error

{¶42} In the second assignment of error, Radabaugh argues that the trial court plainly erred in granting the State's (unopposed) motion to allow Wells, Lewis, and Honaker to be called as court's witnesses pursuant to Evid.R. 614(A). He contends that the State "failed to articulate a sufficient reason that would justify the risk of prejudice" to Radabaugh. (Appellant's Brief at 7). The alleged prejudice

was providing the State with benefits that come with a witness being called by the court instead of by the State.

### 1. Standard of Review

{¶43} As with the first assignment of error, Radabaugh concedes that we review this issue under a plain-error standard because he did not raise it with the trial court. *See also State v. Wesley*, 2002-Ohio-4429, ¶ 7 (8th Dist.). That standard is set forth above in our discussion of the first assignment of error.

### 2. Applicable Law

{¶44} Evid.R. 614 provides that "[t]he court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." The trial court has discretion in deciding whether to call a witness as a court's witness. *State v. Nurein*, 2022-Ohio-1711, ¶ 17 (3d Dist.).

{¶45} "'The purpose of calling a witness as a court's witness is to allow for a proper determination in a case where a witness is reluctant or unwilling to testify'" or "'there is some indication that the witness's trial testimony will contradict a prior statement made to police.'" *Nurein* at ¶ 16, quoting *State v. Baskin*, 2019-Ohio-2071, ¶ 39 (3d Dist.). Additionally, "'[a] witness whose appearance is important to the proper determination of the case, but who appears to be favorable to the other party, is a principal candidate for application of Evid.R. 614(A)." *Id.*, quoting *State v. Renner*, 2013-Ohio-5463, ¶ 23 (2d Dist.). Even prior to enactment of the Ohio

Rules of Evidence, the Supreme Court of Ohio upheld a trial court's decision to call a co-defendant as a court witness where "[t]he trial court had before it ample justification for concluding that [the witness's] testimony would be beneficial to the jury in performing its fact-finding responsibilities," the prosecutor represented to the court that the witness had made prior conflicting statements, and information both indicated the witness's "possible predisposition towards" the defendant yet also suggested "a possible motivation to testify against" the defendant. *State v. Adams*, 62 Ohio St.2d 151, 158 (1980).

**{¶46}** When the court calls a witness, a party does not need to satisfy the surprise and affirmative-damage requirements of Evid.R. 607(A) in order to impeach that witness. *State v. Moody*, 2016-Ohio-8366, ¶ 54 (2d Dist.). This "prevent[s] such a witness from testifying in a manner that is substantially at variance with the witness's prior statements," which otherwise could cause that party "to be 'stuck' with having elicited testimony harmful to the [party] out of the mouth of its own witness." *Id.* Additionally, given that both parties are permitted to cross-examine a court's witness, "both parties may ask the witness leading questions." *State v. Beaver*, 2014-Ohio-4995, ¶ 52 (3d Dist.).

### 3. Analysis

**{¶47}** As eyewitnesses to many of the relevant events, the testimony of Wells, Lewis, and Honaker certainly would be beneficial to ascertaining the truth of

the matter. Additionally, there was some indication their trial testimony would contradict their prior statements made to law enforcement. For example, the State informed the trial court in its motion that "[t]he three witnesses have at different times given made up stories to cover their involvement, and those of other individuals involved" in the matter.[3] The State also expressed concern in its motion that, unless the court called the witnesses, the State would be unable "to challenge [the witnesses'] inconsistent statements or fully explore their potential biases—all to the detriment of the trier of fact and the ultimate quest for the truth." Upon being declared court witnesses, counsel for both parties were able to cross-examine them and the jury was able to determine their credibility. *State v. Curry*, 2007-Ohio-5721, ¶ 17 (8th Dist.).

{¶48} There also was some indication the three witnesses were reluctant to testify. (*See, e.g.,* Apr. 6, 2023 Tr. at 14-15; Motion). In fact, at the trial, Honaker initially refused to take the oath to testify and said, "I'm just not testifying." (Trial Tr. at 1108-1109). All three witnesses were alleged accomplices to Radabaugh in committing the crimes, and the prosecution informed the trial court before it had

---

[3] Subsequently at trial, Wells explained that—while in the car driving away from the scene of Mays' death—they came up with a "cover story" in case they ended up getting caught. (Trial Tr. at 1276-1278). Wells testified that he stuck with that script during subsequent interviews with law enforcement and lied to law enforcement "many times." (*Id.*). Both Honaker and Lewis likewise testified that the group concocted a story and stuck to that fabricated story during initial interviews with law enforcement before changing his or her narrative in later interviews. (*Id.* at 1140-1141, 1214-1215).

ruled on the motion that they were "somewhat allied" with Radabaugh. For example, the State explained in its motion that Lewis had been in a romantic relationship with Radabaugh at the time of the offenses, she was helping to raise his daughter, and they had lived together.[4] We find no error in the trial court's decision to call Wells, Lewis, and Honaker as court's witnesses.

**{¶49}** Radabaugh's second assignment of error is overruled.

### D.    Third Assignment of Error

**{¶50}** In the third assignment of error, Radabaugh claims he was prejudiced by ineffective assistance of counsel. He submits two instances of alleged failures by his trial counsel. First, he complains his trial counsel did not object to the State's motion to allow Wells, Lewis, and Honaker to be called as court's witnesses—the motion we addressed in the second assignment of error. Second, his trial counsel did not file a pretrial motion to suppress his statement to law enforcement that "we bought an ounce and we dropped [Mays] off at the corner." (Trial Tr. at 1074-1075).

---

[4] At trial, Lewis identified a letter she sent to Radabaugh's mother after Lewis had been imprisoned following a plea deal with the State related to the underlying events in this case. In the letter, Lewis said: "I love you guys. I miss you so much. I just want to come home. This is bullshit. My lawyer set me up for failure telling me I have to say Hayden [Radabaugh] did it or I get more time and another charge." (Trial Tr. at 1232). At trial, Lewis testified that she was lying in the letter, which the trial court admitted into evidence. (*Id.* at 1233).

### 1. Standard of Review and Applicable Law

**{¶51}** To establish ineffective assistance of counsel, the appellant "must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Tench*, 2018-Ohio-5205, ¶ 264. Reversal of a conviction or sentence based upon ineffective assistance of counsel requires satisfying this two-pronged test, and the failure to make either showing is fatal to the claim. *State v. Conway*, 2006-Ohio-791, ¶ 165, 168.

**{¶52}** Regarding the first requirement, "[i]n order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment." *State v. Houston*, 2010-Ohio-6070, ¶ 35 (3d Dist.), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance." *Id.*, citing *State v. Sallie*, 81 Ohio St.3d 673, 675, 1998-Ohio-343 (1998). "Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance." *Id.* at ¶ 36, citing *State v. Carter*, 72 Ohio St.3d 545, 558, 1995-Ohio-104 (1995). "Rather, the errors complained of must amount to a substantial violation of

counsel's essential duties to his client." *Id.* When a claim of ineffective assistance of counsel is based on counsel's failure to file a particular motion, the appellant must show that the motion would have had a reasonable probability of success. *State v. Hahn*, 2021-Ohio-3789, ¶ 14 (3d Dist.). Otherwise, "counsel is presumed to have been effective since the filing of the motion would have been a 'futile act,' which the law does not require counsel to undertake." *Id.*

**{¶53}** Regarding the second requirement, "[p]rejudice results when 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Houston* at ¶ 36, quoting *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*

### 2. Analysis

**{¶54}** First, regarding his trial counsel's failure to object to the State's motion asking the court to call several witnesses, Radabaugh has "failed to demonstrate that his trial counsel was deficient for failing to file a response or that such a response would have been successful." *Beaver*, 2014-Ohio-4995, at ¶ 58, 64 (3d Dist.) (no ineffective assistance of counsel where counsel failed to object to the State's motion requesting a witness be declared a court's witness). As we determined in Radabaugh's second assignment of error, the trial court did not err in granting the State's motion declaring Wells, Lewis, and Honaker to each be a court's

witness. *Id.* at ¶ 64. As such, Radabaugh cannot show a response opposing the State's motion would have had a reasonable probability of success. *Id.* Therefore, we conclude that Radabaugh's allegation of ineffective assistance of counsel for failure to oppose the State's motion requesting Wells, Lewis, and Honaker each be called as a court's witness is meritless.

**{¶55}** We also disagree with Radabaugh's assertion that "[t]he failure to object here cannot be considered sound trial strategy." (Appellant's Brief at 12). Deciding not to use resources in opposing a motion when opposition was likely futile—particularly in a case of this scope—does not strike us as deficient performance by counsel or a substantial violation of counsel's essential duties to her client. *See State v. Schwirzinski*, 2010-Ohio-5512, ¶ 66 (6th Dist.) (trial counsel was not deficient where objections "likely would have been futile"). While Radabaugh insists his trial counsel "could have at least credibly argued that the motion, made five months before trial, was premature" (Reply Brief at 4), he has not shown it would have made any difference if the trial court made its ruling on the motion closer to the time the witnesses testified during the trial.

**{¶56}** Next, regarding his trial counsel's failure to file a pretrial motion to suppress, Radabaugh has not shown that he suffered prejudice from admission of his statement that "we bought an ounce and we dropped [Mays] off at the corner." (Trial Tr. at 1074-1075). Other evidence clearly established that Radabaugh had

come into contact with Mays on the night of Mays' death. *State v. Drummond*, 2006-Ohio-5084, ¶ 222 (counsel was not ineffective for failing to object to an opinion identifying "brain matter" at the crime scene because defendant "suffered no prejudice" from the statement given other evidence clearly established the victim died of a gunshot to the head). Ultimately, given all the other evidence presented at trial, there is no reasonable probability that the result of the proceeding would have been different had Radabaugh's trial counsel filed a successful motion to suppress Radabaugh's statement.

{¶57} Radabaugh's third assignment of error is overruled.

### E. Fifth Assignment of Error

{¶58} In the fifth assignment of error, Radabaugh contends that the trial court plainly erred in admitting gruesome photos of the crime scene. He argues that the State "offered several photographs of the crime scene that were gruesome, prejudicial, and unnecessary," serving "no purpose other than to inflame the jury" given that other evidence showed Mays died from gunshot wounds. (Appellant's Brief at 18). The State responds that the photos show the extent of the injuries May suffered and the intentionality with which Radabaugh shot him—which bear on elements the State needed to prove for its aggravated murder charges.

### 1. Standard of Review

**{¶59}** Whether to permit the introduction or admission of photographs is left to the sound discretion of the trial court. *State v. Ream*, 2013-Ohio-4319, ¶ 101 (3d Dist.); *State v. Motley*, 2023-Ohio-1811, ¶ 49 (8th Dist.); *see also* Evid.R. 403, 611(A). However, as Radabaugh concedes, we review this issue under a plain-error standard because he never raised it with the trial court. *See also State v. Trimble*, 2009-Ohio-2961, ¶ 132; Crim.R. 52(B). That standard is set forth above in our discussion of the first assignment of error.

### 2. Applicable Law

**{¶60}** "[A] trial court may reject an otherwise admissible photograph which, because of its inflammatory nature, creates a danger of prejudicial impact that substantially outweighs the probative value of the photograph as evidence." *State v. Morales*, 32 Ohio St.3d 252, 257 (1987); *see also* Evid.R. 403(A). However, the mere fact that a photograph is gruesome or horrendous is not sufficient to render it automatically inadmissible. *State v. Jackson*, 2004-Ohio-4016, ¶ 12 (3d Dist.). Additionally, a defendant's stipulation to the cause of death does not automatically render a photograph inadmissible. *Id.* at ¶ 13.

**{¶61}** Given that Radabaugh was convicted of Count 1, our analysis centers on that count of aggravated murder, which charged a violation of R.C. 2903.01(A). Under that statute, "[n]o person shall purposely, and with prior calculation and

design, cause the death of another . . . ." "A person acts purposely when it is the person's specific intention to cause a certain result . . . ." R.C. 2901.22(A).

**{¶62}** Intent to kill may be proven by direct testimony or "'deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound.'" *State v. Stallings*, 89 Ohio St.3d 280, 290, 2000-Ohio-164 (2000), quoting *State v. Robinson*, 161 Ohio St. 213 (1954), paragraph five of the syllabus. For example, evidence at trial indicating the victim sustained defensive wounds and a fractured nose and died from multiple gunshot wounds—including being shot through her face—would support a finding that the defendant acted purposely in causing the victim's death. *State v. Pinyerd*, 2024-Ohio-2521, ¶ 52 (3d Dist.). Thus, where the State has the burden of proving the killing was done "purposely" and with "prior calculation and design," photographic evidence of the injuries sustained by the victim, the cause of the victim's death, and the proximity of the shooting are all probative of the defendant's purpose and design to cause the victim's death. *Jackson* at ¶ 7, 11 (no error where trial court admitted eleven crime scene photos, despite argument by the defendant convicted of aggravated murder that the images were gruesome and inflamed the jury's passion).

### 3.      Analysis

**{¶63}** Radabaugh does not specify which photos he believes are gruesome, but he does specifically address Exhibits 85 and 88 in his brief.  Exhibit 85 portrays part of Mays' right side, showing some of the wounds to his chest and face, with his right arm covered by a shirt.  Exhibit 88 is a close-up of Mays' left hand with blood on it and a potential injury to the left palm.

**{¶64}** Radabaugh has not established plain error by the trial court in allowing these particular photos or any of the crime scene photos (i.e., Exhibits 83 through 100) to be admitted.  Special Agent Hammond of the Ohio Bureau of Criminal Investigation testified that all of the photographs from where Mays was killed fairly and accurately depicted what he saw when he arrived to process the scene on July 7, 2021.  Special Agent Hammond explained that crime scene photos showed wounds to Mays' body (including multiple wounds to his chest and torso), as well as the rainy weather conditions, placards indicating where different pieces of evidence were found, and the general area where Mays' body was found—on a two-lane road surrounded by dense woods.

**{¶65}** Some of the crime scene photographs were not gruesome.  Regarding the others, "although gruesome, [the photographs] were probative of [Radabaugh's] intent and the manner and circumstances of" Mays' death.  *Trimble*, 2009-Ohio-2961, at ¶ 134 (upholding admission of "close-up photograph showing the gunshot

wound on the back of" the victim's head). None appear to be duplicative, and Special Agent Hammond explained that certain photos show particular things better than the others. *See Ream*, 2013-Ohio-4319, at ¶ 104 (3d Dist.) (trial court did not err in permitting "somewhat gruesome" photos to be introduced where "they accurately depict[ed] the crime scene and the state of [the victim's] body after he was shot seven times," and the "State needed to prove, beyond a reasonable doubt, that" defendant purposefully meant to kill the victim). Further, one of the paramedics on the scene testified that two of the crime scene photos showed the rough position of where Mays' body was found. Using the photo, the paramedic also pointed out where he found a bullet casing.

{¶66} The crime scene photos illustrated the testimony of the paramedic and law enforcement officers who discovered Mays' body, and they portrayed the crime scene and condition of the body. *See State v. Nields*, 93 Ohio St.3d 6, 26, 2001-Ohio-1291 (2001) (demonstrating probative value of crime scene photos). They also illustrated their testimony of the victim's injuries and helped to prove the killer's intent. *Id.* (rejecting claim that defendant was unfairly prejudiced by the admission of several crime scene photos that defendant argued were gruesome and cumulative); *see also Trimble*, 2009-Ohio-2961, at ¶ 136. We find no error in their admission, let alone error that would support plain-error relief.

{¶67} Radabaugh's fifth assignment of error is overruled.

### F. Sixth Assignment of Error

**{¶68}** In the sixth assignment of error, Radabaugh asserts that the trial court failed to notify him at the sentencing hearing of the items set forth in R.C. 2929.19(B)(2)(c), as required by statute when a prison term is a non-life felony indefinite prison term. The State concedes that the trial court erred by failing to advise Radabaugh of the notifications required when the court imposes an indefinite term of incarceration under the Reagan Tokes sentencing scheme. (Appellee's Brief at 28).

**{¶69}** When required to provide such notifications, a sentence is contrary to law if the trial court fails to comply with R.C. 2929.19(B)(2)(c) at the sentencing hearing. *State v. Tupps*, 2023-Ohio-2097, ¶ 36 (3d Dist.). This is true even when an indefinite prison term imposed pursuant to the Reagan Tokes Act and subject to the requirements of R.C. 2929.19(B)(2)(c) is coupled with a term of life imprisonment. *State v. Holland*, 2023-Ohio-4834, ¶ 2, 96-97 (2d Dist.) (where defendant was sentenced to imprisonment of 15 years-to-life for murder, an indefinite term for another offense, and definite terms for other offenses, finding the indefinite sentence for the single offense (only) was contrary to law pursuant to R.C. 2929.19(B)(2)(c)).

**{¶70}** Because the trial court found consecutive sentencing was necessary, the court imposed a life sentence for the aggravated murder and additional sentences

for the other offenses, including a prison term of 11 years minimum up to 16.5 years for the aggravated robbery. Consequently, the court had to comply with R.C. 2929.19(B)(2)(c) and provide the required notifications.

{¶71} Having searched the sentencing transcript, we agree with the parties that the trial court did not fulfill the requirements of the statute by notifying Radabaugh of all the information set forth in R.C. 2929.19(B)(2)(c). Accordingly, we find that Radabaugh's sentence, only as to Count 4, is contrary to law and he must be resentenced in accordance with R.C. 2929.19(B)(2)(c). *Holland* at ¶ 97.

{¶72} Radabaugh's sixth assignment of error is sustained.

## G. Seventh Assignment of Error

{¶73} In the seventh assignment of error, Radabaugh challenges three financial items ordered by the trial court: (1) payment of the $20,000 fine; (2) assessment of court-appointed-counsel fees; and (3) payment of $7,482.24 in restitution. Radabaugh specifically challenges them pursuant to R.C. 2953.08(A)(4) as being contrary to law. We address the three items separately.

### 1. Fine for Aggravated Murder

{¶74} Radabaugh contends the $20,000 fine is contrary to law and asks that it be vacated because the trial court did not consider his ability to pay when it imposed the fine, as required by R.C. 2929.19(B)(5). Importantly, the basis for

Radabaugh's challenge to the fine is R.C. 2953.08. That statute provides, in relevant part:

> In addition to any other right to appeal and *except as provided in division (D) of this section*, a defendant who is convicted of . . . a felony may appeal as a matter of right the sentence imposed upon the defendant on one of the following grounds: . . . (4) The sentence is contrary to law.

(Emphasis added.) R.C. 2953.08(A)(4).

**{¶75}** Here, an exception in division (D) of the statute applies to preclude our review of the fine. The fine is part of "[a] sentence imposed for aggravated murder" pursuant to R.C. 2929.02(A), so it "is not subject to review under" R.C. 2953.08. R.C. 2953.08(D)(3); *see also State v. Patrick*, 2020-Ohio-6803, ¶ 12-13, 17; *State v. Peters*, 2019-Ohio-4461, ¶ 17 (8th Dist.) ("under R.C. 2953.08(D)(3), we lack statutory authority to review [defendant's] $20,000 fine for aggravated murder and overrule his assignment of error to that extent").

### 2. Court-Appointed-Counsel Fees

**{¶76}** Next, Radabaugh maintains that requiring him to pay court-appointed-counsel fees was contrary to law because the trial court never inquired of his ability to pay, despite his argument at sentencing that he lacked the ability. Radabaugh contends the trial court's decision also conflicted with its own finding that he lacks the ability to pay.

**{¶77}** The trial court stated in its sentencing entry that "[t]he Court inquired of Defendant and finds that Defendant has, or reasonably may be expected to have, the means to pay all of the court costs, court appointed counsel fees, and any restitution or reimbursement." (Dec. 21, 2023 Entry of Sentence at 10). During the sentencing hearing, the trial court ordered that Radabaugh "pay the court costs, including court-appointed counsel fees as a civil assessment for which judgment is rendered." (Dec. 19, 2023 Tr. at 44). There was little information or discussion of Radabaugh's finances and ability to pay the $20,000 fine, restitution, and court costs, and no specific discussion at all about his ability to pay court-appointed-counsel fees.

**{¶78}** "[T]he trial court in a criminal case has the authority to impose court-appointed-counsel fees upon a defendant." *State v. Taylor*, 2020-Ohio-6786, ¶ 24. Pursuant to statute, appointed counsel shall be paid "by the county the compensation and expenses that the trial court approves." R.C. 2941.51(A). The statute continues:

> The fees and expenses approved by the court under this section shall not be taxed as part of the costs and shall be paid by the county. However, if the person represented has, or reasonably may be expected to have, the means to meet some part of the cost of the services rendered to the person, the person shall pay the county an amount that the person reasonably can be expected to pay.

R.C. 2941.51(D). "Thus, under the plain language of the statute, the person represented by court-appointed counsel may be required to pay some or all of the

expenses of that representation." *Taylor* at ¶ 17. The statute does not require "a court to make explicit findings as a prerequisite to assessing appointed-counsel fees." *Id.* at ¶ 26. Yet, "making such findings explicitly on the record is the best practice" and "doing so would give the parties a better understanding of the trial court's determination and would enable the appellate court to conduct a more meaningful review of the imposition of fees." *Id.* at ¶ 28.

{¶79} Moreover, the assessment of court-appointed-counsel fees is not part of a defendant's sentence. *Id.* at ¶ 35, 37. Therefore, we do not review the issue under R.C. 2953.08 for appeals based on felony sentencing. "The trial court's decision to order a defendant to pay the fees of a court-appointed attorney is subject to an abuse of discretion standard of review." *State v. Trembly*, 137 Ohio App.3d 134, 144 (8th Dist. 2000). Thus, we must decide whether the trial court abused its discretion in finding that Radabaugh has, or reasonably may be expected to have, the means to pay court-appointed-counsel fees. *See id.*; *State v. Smith*, 2023-Ohio-126, ¶ 18 (11th Dist.) ("we review questions of fact for abuse of discretion"). A trial court abuses its discretion when its conduct is unreasonable, arbitrary, or unconscionable. *State v. Hill*, 2022-Ohio-4544, ¶ 9.

{¶80} As an initial matter, the trial court did not specify "an amount that [Radabaugh] reasonably can be expected to pay." R.C. 2941.51(D). Instead, the trial court found he has, or reasonably may be expected to have, the means to pay

*all* court appointed-counsel fees, without identifying the monetary amount.[5] (Sentencing Entry at 10).

**{¶81}** While recognizing that a trial court is not required to make explicit findings as a prerequisite to assessing appointed-counsel fees, and setting aside whether the trial court here actually did make an inquiry about Radabaugh's means to pay such fees, the trial court abused its discretion in finding that Radabaugh has, or reasonably may be expected to have, the means to pay all court-appointed-counsel fees.

**{¶82}** At the sentencing hearing on December 19, 2023, the State asserted that Radabaugh "was working as a security guard," "had income," and "still could buy his own dope." (Dec. 19, 2023 Tr. at 18-19). However, Radabaugh's counsel pointed out that Radabaugh had been incarcerated since 2021, initially on an unrelated crime. Moreover, on November 22, 2022, the trial court had found Radabaugh was indigent and appointed counsel for him. His defense counsel further explained at the sentencing hearing that Radabaugh "has no income at this point in time" and "has no income moving forward." (*Id.* at 30).

---

[5] We realize trial courts will rarely know the amount of appointed counsel's fees at the time of sentencing. However, in this case, it was clear that counsel represented Radabaugh for over a year, having been appointed in November of 2022, serving through a multi-day jury trial, and concluding with sentencing in December of 2023. The record shows the trial court subsequently approved appointed counsel fees in the amount of $14,568.

**{¶83}** During the sentencing hearing, the trial court indicated it had reviewed the presentence investigation report ("PSI"). The relatively short Employment and Financial History section in the PSI indicates that Radabaugh was employed for only a few months since January of 2017 (and at relatively low hourly pay), and he was fired from two jobs during that time frame due to being incarcerated. It appears the State's reference to Radabaugh having a job and income referred to one of those short stints of employment, namely when he was employed by a security company between February and July 2021—the month of Mays' death. The PSI also indicates this employment could not be verified. Further, he had an extensive prior adult criminal record, including several stretches between 2015 and 2021 when he was incarcerated.[6] The PSI also indicates that Radabaugh's Financial Disclosure form states he has no monthly income, expenses, or liquid assets. Relevant to potential future income, the trial court sentenced Radabaugh to a total aggregate sentence of life in prison without the possibility of parole plus 23 to 28.5 years in prison. Thus, the record indicates that Radabaugh had little to no current income or assets and little prospect of generating income or assets in the future.

**{¶84}** Additionally, the trial court explained at the sentencing hearing that "[a]ny and all payments will be applied to restitution one half and the remaining one

---

[6] Radabaugh was a juvenile before 2015.

half to fines and court costs." (Dec. 19, 2023 Tr. at 49). Court-appointed-counsel fees are not court costs, thus indicating any payment for the fees here would come after the other payment obligations had been satisfied. *Taylor*, 2020-Ohio-6786, at ¶ 35, 37. Significantly, the trial court stated: "I am not going to order any fines on any of the remaining counts. At some point it becomes superfluous and really has no reason, and I think what's done in the way of financial is probably more than he'll ever be able to pay realistically unless at some point he would be released or has an inheritance or comes into some money somehow." (Dec. 19, 2023 Tr. at 48-49). When one views this statement in the context of the information in the PSI, the trial court's decision on November 22, 2022 that Radabaugh was indigent, and the fact Radabaugh was then continuously incarcerated—all coupled with the trial court's decision to sentence Radabaugh to imprisonment for the rest of his life without the possibility for parole and order restitution of $7,482, a $20,000 fine and court costs,[7] we find it was unreasonable for the trial court to find Radabaugh has, or reasonably may be expected to have, the means to pay the court-appointed-counsel fees. No evidence supported that Radabaugh will be released from prison, receive "an inheritance or come[] into some money somehow"—and every

---

[7]The court cost certified by the clerk of courts totaled over $15,000. (Jan. 10, 2024 Certification).

incarcerated person could potentially receive an inheritance or somehow come into money.

**{¶85}** Therefore, we vacate the imposition of court-appointed-attorney fees. *See State v. Miller*, 2002-Ohio-853, 2002 WL 313380, *2-3 (6th Dist. Mar. 1, 2002) (finding insufficient evidence in the record to establish appellant would reasonably be expected to have the means to pay for the expense of his court-appointed counsel and vacating the requirement that he pay that expense); *State v. Patterson*, 2024-Ohio-2198, ¶ 15-18 (6th Dist.) (evidence in the record was insufficient to impose the court-appointed-counsel fees—and therefore vacating them—where, although appellant was only 22 years old and sentenced to 18 months in prison, he had a lengthy criminal record, had been incarcerated for three years, had no verified employment history, and had not completed high school).

### 3. Restitution

**{¶86}** Radabaugh similarly contends that ordering him to pay restitution was contrary to law because the trial court never inquired of his ability to pay and he had argued at the sentencing hearing that he lacked the ability. At the sentencing hearing, the trial court "note[d] that restitution under the Ohio Constitution is mandatory." (Dec. 19, 2023 Tr. at 49).

**{¶87}** Radabaugh's contention fails. Pursuant to R.C. 2929.18(A)(1), a trial court generally may impose restitution as part of a felony sentence. As Radabaugh

stresses, before imposing such a financial sanction, R.C. 2929.19(B)(5) requires that a trial court "consider the offender's present and future ability to pay the amount of the" financial sanction. R.C. 2929.19(B)(5). However, "the constitutional amendment known as Marsy's Law supersedes R.C. 2929.19(B)(5) to the extent it allows a trial court to order less than full restitution to a victim." *State v. Oliver*, 2021-Ohio-2543, ¶ 54 (12th Dist.); *see also State v. Johnson*, 2022-Ohio-573, ¶ 4, fn. 1 (3d Dist.) (recognizing the holding in *Oliver* that R.C. 2929.19(B)(5) "has been found to be unconstitutional when applied to victims of offenses pursuant to Marsy's Law").

{¶88} Marsy's Law became effective on February 5, 2018 and expanded the rights afforded to victims of crimes. *Oliver* at ¶ 57. In relevant part, it provides:

> (A) To secure for victims justice and due process throughout the criminal and juvenile justice systems, a victim shall have the following rights, which shall be protected in a manner no less vigorous than the rights afforded to the accused: . . .
>
>> (7) to full and timely restitution from the person who committed the criminal offense or delinquent act against the victim; . . .
>
> . . .
>
> (D) As used in this section, 'victim' means a person against whom the criminal offense or delinquent act is committed or who is directly and proximately harmed by the commission of the offense or act. The term 'victim' does not include the accused or a person whom the court finds would not act in the best interests of a deceased, incompetent, minor, or incapacitated victim.

> (E) All provisions of this section shall be self-executing and severable, and shall supersede all conflicting state laws.

Ohio Const., art. I, § 10a. We agree with the Twelfth District's analysis and conclusion in *Oliver* that R.C. 2929.19(B)(5) irreconcilably conflicts with the language of Marsy's Law. *Oliver* at ¶ 55-71. This includes that "[a]llowing the consideration of the offender's ability to pay to potentially lessen or eliminate the amount of restitution owed to a victim [pursuant to R.C. 2929.19(B)(5)] would effectively render the word 'full' [in Marsy's Law] meaningless." *Id.* at ¶ 67, 71. Therefore, in this case, the trial court was not required to consider Radabaugh's ability to pay before ordering restitution. *Oliver* at ¶ 54; *see also* Ohio Const., art. I, § 10a(A)(7), (E); *Cleveland v. Rudolph*, 2022-Ohio-2363, ¶ 18-19 (8th Dist.) ("[w]hether a defendant is unable to pay the amount of restitution is irrelevant under Marsy's Law," and the defendant's "inability to pay restitution is not a valid basis on which the court could decline an order of restitution").

{¶89} Radabaugh's seventh assignment of error is overruled, in part, and sustained, in part.

## IV. CONCLUSION

{¶90} For the foregoing reasons, Radabaugh's first, second, third, fourth, and fifth assignments of error are overruled; Radabaugh's sixth assignment of error is sustained; and Radabaugh's seventh assignment of error is overruled in part and

sustained in part. Having found error prejudicial to Appellant, we affirm, in part, and reverse, in part, the December 21, 2023 judgment entry of the Hardin County Court of Common Pleas. Consistent with our resolution of the seventh assignment of error, we vacate the imposition of court-appointed-counsel fees. We remand this matter to the trial court with instructions to resentence Appellant in a manner consistent with this opinion. We affirm the trial court's judgment in all other respects.

***Judgment Affirmed, in part,***
***and Reversed, in part.***

**WILLAMOWSKI, P.J. and ZIMMERMAN, J., concur.**

**/jlm**